## ANDREWS *vs.* ANDREWS.

[BILL IN EQUITY BY WIFE AGAINST HUSBAND FOR SPECIFIC PERFORMANCE OF POST-NUPTIAL AGREEMENT.]

1. *Variance between allegations and proof.*—In a bill for specific performance, the failure to prove an alleged stipulation of the contract which the law implies is no variance; as where the bill alleges an agreement by the husband to settle property on the wife, *for her sole and separate use,* and the evidence fails to show the *exclusiveness* of the promised gift.

2. *Certainty requisite in contract.*—It was objected in this case, on the part of the defendant, that the uncertainty in the terms of the contract was an insuperable obstacle to its specific execution; but the court, while admitting that great certainty and precision in the averment and proof of contracts, whether verbal or written, were indispensable pre-requisites to their specific execution, held that, in view of the looseness and inaccuracy of language which showed that the parties and witnesses were uneducated, and construing the inartificial expressions of the parties by their subsequent declarations showing the meaning which they attached to the words, the terms of the contract were sufficiently certain.

3. *Contract must be fair, just, and reasonable.*—It is an unquestioned doctrine of equity, that only those contracts which are fair, just, and reasonable, will be specifically executed.

4. *Inadequacy of consideration.*—When the inadequacy of consideration shows that the contract is unfair, inequitable, or unconscionable, even though it might not be sufficient, if the contract were executed, to induce the court to rescind or set it aside, a specific performance will be refused.

5. *When equity will sustain and enforce post-nuptial voluntary settlement in favor of wife.*—Equity will sustain a post-nuptial voluntary settlement in favor of the wife, when executed, and will specifically enforce, as against any other person than the party himself, an agreement to make such a settlement; but it will not specifically execute such an agreement against the party himself, because, until executed, it is revocable.

6. *What consideration will sustain specific execution of agreement to make such settlement.* Neither the moral obligation of the husband to provide for his wife, nor the fact that he received property by her, nor both these considerations together, will justify a specific execution of a post-nuptial agreement on his part to make a settlement on her; but when, superadded to these, there is a valuable consideration, irrevocably executed on the part of the wife, a specific performance will not be refused on account of the inadequacy of that consideration. In this case, the court decreed a specific performance of an agreement to settle on the wife slaves valued at more than $4,000, in consideration of her relinquishment of dower in certain lands sold at $2,600; it being also alleged and proved, that the husband received the slaves, with other property, by the wife, and that there were no children of the marriage to be provided for.

7. *When contracts concerning personalty will be specifically enforced.*—Generally, equity will not specifically enforce contracts concerning personal property, because there is a remedy at law in a suit for damages; but where there is no remedy at law, as in case of post-nuptial agreements between husband and wife, a specific performance may be decreed.

8. *Removal of husband as trustee.*—Where the wife files a bill against her husband to compel the specific execution of an agreement to make a settlement on her, and does not allege that she is separated from him on account of his improper conduct, or that he intends to remove from the State without her, or that she has reasons to apprehend a denial of her right to the property settled on her by the court, or that his habits are such as render him incapable of or unfit for the discreet and proper management of the estate, the court will not appoint another trustee in his stead, nor forbid his interference with the property.

APPEAL from the Chancery Court of Limestone. Heard before the Hon. A. J. WALKER.

This bill was filed by Mrs. Mary Ann Andrews, suing by her next friend, against her husband, Richard I. Andrews, in February, 1852. The cause was submitted to the chancellor, for final decree, on bill, answer, and proof, at the May term, 1854; was held under advisement by him, by consent, until August; and a decree then rendered, in vacation, which con-

tains a full statement of the entire case, and which is here
adopted as the opinion of the court.    That decree is as follows:

WALKER, CH.—The bill alleges, that the complainant in-
termarried with the defendant in 1837, and has since lived
with him; that her entire interest in the estate of her former
husband went into the possession of the defendant, and be-
came his property; that by the will of her father, which was
admitted to probate in 1838, two negroes, Sarah and Pleas-
ant, were bequeathed to her, ' during her natural life, and at
her death to go to her bodily heirs'; that these negroes were
reduced to possession by the defendant, who has also received
other property, *jure mariti*, besides gifts from complainant's
father, the amount of which is not known, and is not stated;
that Sarah has since become the mother of seven children,
who are also in the defendant's possession; that the defend-
ant has property, aside from the negroes derived from the
estate of complainant's father, adequate to the payment of his
debts, and to his pecuniary independence; that, contempla-
ting a change of residence to another State, the defendant
sold his lands, in two parcels,—one to P. W. Wilkinson, and
the other to Thos. G. Ezzell,—for the aggregate sum of
$2,600; that the complainant refused to assign her right of
dower in these lands, until she was thereto induced by the
defendant's promise that he would settle on her, to her exclu-
sive use, the negro woman Sarah and her children; that com-
plainant, influenced by this promise, joined in the conveyance
of said lands by the defendant, who afterwards refused to
comply with his promise, and was about to remove the ne-
groes to the State of Arkansas; that the negroes are family
slaves, between whom and complainant there exists a strong
personal attachment; and that no mere remuneration by way
of damages, or substitution of other property of equal general
value, would compensate for their loss.

The bill prays for an injunction *pendente lite*, for a specific
performance, and for such other and further relief as may
seem just and equitable.

The material statements of the answer, which are neces-
sary to a comprehension of the points discussed and decided
in this opinion, are as follows:  Respondent received only

$300 from the estate of complainant's deceased husband, and from her father's estate the negroes described in the bill; but has received no other property 'by virtue of his relations to complainant.' He has sufficient property to pay all his debts; but, after their payment, there will be 'but a small property left.' He had two quarter-sections of land, one of which he sold to Wilkinson, for $1,600, 'and the other to Thos. G. Ezzell, on a credit of one, two, and three years; having received from him, in part payment, a stud-horse, supposed to be worth about $400, and the $600 being only payable in one, two, and three years.' The answer denies 'that complainant refused to relinquish her right of dower in the land sold to Wilkinson, without a pecuniary equivalent therefor'; and proceeds to say that, ' *after signing the deed to Wilkinson*, some conversation occurred between respondent and complainant, and respondent replied that he was willing for her to have her *stuff*.' At the time complainant relinquished her dower to Ezzell, she told respondent, that she would sign the deed, provided he would give her Sarah and her children; to which respondent replied, 'that he had told her what he would do *after* she had relinquished her dower to the tract sold to Wilkinson. She then repeated the proposition, that she would sign it, provided respondent would give her Sarah and her children; ' respondent replied, that she might take them in an hour, if she wanted to'; whereupon she signed it. ' *This is the only contract, and all of the contract, that was made between respondent and complainant, in relation to her relinquishment of dower in the lands of respondent,—if contract it can be called.*' The negroes claimed by complainant are worth between $4,000 and $5,000, and respondent did not regard the conversation above stated as a contract. At the time complainant relinquished her dower, respondent had only six negroes, besides Sarah and her children, which were together worth about $4,100; the remainder of his property, besides his crop, brought at auction about $300; and the crop sold for $720. Since the relinquishment of dower, respondent has paid various debts, amounting in the aggregate to $3,400; and he owes other debts, but principally as surety. The answer admits the defendant's refusal to settle the negroes on complainant, and denies that complainant has any par-

ticular or special attachment for the *children* of Sarah; but says nothing as to complainant's attachment to Sarah, or of the attachment of the negroes *to* her; nor does the answer admit or deny 'that no mere remuneration by way of damages, or substitution of other property, could compensate complainant for the loss of the negroes.' The answer alleges, that the complainant, after relinquishing her dower, abandoned respondent, and refused to go with him to Arkansas; and that the contingent right of dower in the Ezzell land was not worth more than $200.

I have not set forth above everything contained in the bill or answer, but only so much as seemed necessary to manifest the points in controversy.

It will be perceived, that the defendant denies that the complainant was induced to relinquish her dower in the Wilkinson and Ezzell tracts of land, by his promise to settle upon her the negroes Sarah and her children. If it be conceded that the answer impliedly admits the contract, that complainant should have the negroes, in consideration that she *had* assigned her dower in the Wilkinson tract, and *would* assign it in the Ezzell tract; it remains to be determined, whether the denial of the answer, that the contract was made before the assignment of dower in the Wilkinson tract, and induced that assignment, renders it necessary for the complainant to prove by two witnesses, or by one witness with corroborating circumstances, the correctness of the bill as to the disputed point of time when the contract was made, and the inducement *to it.* The bill and answer are clearly at issue, as to the point of time when the contract was made, and as to the inducement to the defendant's promise. Now, if the law requires the complainant to sustain the bill, as to the controverted points, at all, the defendant is entitled to the benefit of his sworn denial on those points. The authorities clearly show, that the complainant must establish her contract, even as to the consideration, as it is alleged.— 1 Greenl. Ev. § 68; Freeman v. Swan, 22 Ala. 106; Flake & Freeman v. Day & Co., *ib.* 132. If the complainant is required to establish the contract averred, it must be proved by two witnesses, or by one witness with corroborating circumstances; and to determine whether she has sustained the

Andrews v. Andrews.

bill by the required measure of proof, it is necessary to look
to the testimony.

Mrs. Beckham proves a distinct admission by the defendant
that 'he had given up' Sarah and her children to complain-
ant, to relinquish her dower in the land to Wilkinson and
Ezzell.   William P. Long says, that he presented the deed to
Wilkinson to complainant, to sign; that complainant told
defendant that she had signed the deed, and that she wanted
him to do as he had promised,—'to give her up her stuff, or
truck, which her father had given her,—to which defendant
replied, that he would do what he had said'; that when the
defendant retired, for the purpose of allowing his wife to
sign the deed to Ezzell in his absence, (which was supposed
to be necessary,) she called him, and told him that she had
not signed the deed, and that she did not intend to do so,
unless he would give her up Sarah and her children; that the
defendant replied, that he had told her what he would do, in
the presence of the witness, when she had signed the other
deed; that complainant persisted in her requisition, that she
would not sign the deed, unless he would say that he would
give her up Sarah and her children; that defendant said, she
might take them in an hour, and afterwards remarked to
him, 'What good did she think his simple promise, without
going into writing, would do her.'   Mrs. Stinnett testifies,
that the defendant told her, ' that all he wanted complainant
to do was to sign his land to him, and he would give her up
her property.'

The complainant's declarations, proved by Eliza West, and
brought out by defendant's question, are evidence, and show
that the complainant was to give up her interest in the land,
while the defendant was to give up to her Sarah and her
children.

I do not regard Patterson's deposition as irreconcilable
with Mrs. Beckham's; the apparent inconsistency between
them may be accounted for, upon the supposition, either that
neither of them heard the entire conversation to which they
depose, or that they recollect different parts of the con-
versation.   Having reconciled the testimony of these two
witnesses, without impugning the veracity of either, and
there being no other conflict, apparent or real, between the

testimony of defendant and complainant as to the contract, the next inquiry is, whether the proof establishes the contract as alleged in the bill.

The depositions of the witnesses, whose testimony on this point I have abridged above, when construed in reference to each other, in reference to the restricted admissions of the answer, and in reference to the looseness and inaccuracy of language characterizing the expressions of uneducated parties and witnesses, establish with satisfactory certainty the contract as alleged, except that none of the witnesses show that the *exclusiveness* of complainant's right was a subject of special stipulation. This, however, can make no difference, as the law implies that portion of the contract alleged which is not proved. If the husband make a conveyance to his wife, the law will intend that it was for her separate use; and the same reason which sustains that doctrine, irresistibly impels us to the conclusion, that an agreement by the husband to settle on the wife will be intended to be for her separate use.—McWilliams v. Ramsey, 23 Ala. 816; Williams v. Maull, 20 *ib.* 720.

At the hearing, it was earnestly contended on the part of the appellant, that the uncertainty in which the proof left the question as to what was the contract of the parties, was an insuperable obstacle to the specific performance. I concur with the counsel for the defendant, in the opinion that great certainty and precision in the averment and proof of contracts, whether verbal or written, are indispensable prerequisites to their specific performance; but my examination has led me to accord to the complainant's case a compliance with the exactions of the rule. To sustain this conclusion, let us again recur to the testimony.

We learn from Long's deposition that, after the complainant had signed the deed to Wilkinson, she addressed the defendant, and said, " that she had signed the deed, and that she wanted him to do *as he had promised,*—to give her up her stuff, or truck, which her father had given her; to which the defendant replied, that he would do what he had said." From this conversation the candid inquirer cannot fail to infer an acknowledgment by the defendant, under circumstances entitling it to the greatest weight as evidence, that he had

agreed, before complainant's transfer of her dower in either of the tracts of land, to do that which complainant expresses by the homely and somewhat obscure language, "give her up her stuff, or truck, which her father gave her." If, by the words "stuff or truck which her father gave her," she meant the entire property bequeathed by her father to her, then the contract proved is not identical with the contract alleged; because complainant's father bequeathed her other property, besides Sarah and her children. But subsequent occurrences conclusively show, that the parties understood these words in a sense consistent with the contract alleged. When the deed to Ezzell was signed, complainant required, before signing the deed, that the defendant should give her up "Sarah and her children"; and defendant replied, that he had told her, in the presence of the witness Long, when she signed the first deed, what he would do. Complainant persisted in her requisition, that defendant should say he would give her up Sarah and her children; to which, at length, defendant distinctly assented, by saying "that she might take them in an hour." The fair construction of this conversation is, that the complainant, before signing the deed to Ezzell, required a repetition of the previous contract; that the defendant objected to repeating the contract, but re-affirmed it, by saying that he would do what he had previously promised; and that he at length yielded to complainant's persistency.

The construction which imputes a reference by the parties, in their contract, to Sarah and her children as the subject of the contract, is confirmed by the testimony of Mrs. Beckham, that defendant admitted, after the execution of both deeds, that he had given up Sarah and her children to complainant. This testimony leaves no room for doubting that the defendant himself understood the negroes named to be the subject of the contract; and he will not be permitted to gainsay a construction sanctioned by his own admission.

The inartificial character of the language used, both by the witnesses and by the parties, forbids me to give any prominence or serious consideration to the apparent inconsistency of the other testimony with Mrs. Beckham's, in reference to the use by her of the words "had given up." I can well conceive that one unskilled in the use of language, as was evi-

dently the case with complainant, might say, in seeking an admission of the contract to settle upon her the negroes, "Have you not given up the negroes to me?" I must regard the evidence of Mrs. Beckham as corroborating that of Long, and reconcilable with it; and to this may be added, if further confirmation or greater security can be necessary, the evidence of Mrs. Eliza West.

It is an unquestioned doctrine of equity, that only those contracts which are fair, just and reasonable, will be specifi- cally performed. The case of Gould v. Womack and Wife, 2 Ala. 83, recognizes the principle, that when the considera- tion of a contract is so disproportioned to the value of the thing agreed to be conveyed, as to evidence the want of fair- ness, equity and justice, a specific performance will be re- fused. The cases which define the inadequacy of considera- tion necessary to induce a court to rescind, or set aside, or annul a contract, are based upon a principle different from that which applies in cases where a specific performance of an unexecuted contract is sought, and are, in my judgment, not available as arguments for the complainant.—See Hoot v. Sorrelle, 11 Ala. 399; 2 Story's Equity, § 769; 1 ib. § 244; Beck v. Simmons & Kornegay, 7 Ala. 771; Judge v. Wilkins, 19 ib. 765; Juzan v. Toulmin, 9 ib. 686.

Whether a court of chancery will compel the performance of an unexecuted contract, depends upon judicial discretion, to be exercised consistently with law. If the court finds the contract unfair, unjust, inequitable, or unconscionable, on account of the inadequacy of the consideration or other cause, it will not execute the contract. Now, if the assign- ment of complainant's contingent right of dower was the only consideration which induced the defendant's promise, this court could not, consistently with the principles settled in Gould v. Womack, supra, and in Casey v. Holmes, 10 Ala. 788, afford its sanction to the complainant's application. I think, however, the bill substantially avers, and the proof establishes, that there was another additional inducement to the contract.

We learn that the motive of the contract was to provide for the wife, from the statement in the bill, that complainant refused to relinquish her dower, without a pecuniary equiva-

lent "*which would provide for her future wants*." The bill
avers, also, that the complainant had a meritorious and equi-
table claim to a settlement, on account of the property re-
ceived by her husband *jure mariti*. A contract may be as
well sustained by an implied, as by an express consideration.
The fair and reasonable implication from these averments in
the bill, from the facts and conversations proved, and from
the admissions in the answer, is, that neither the complainant
in asking, nor the defendant in making the promise alleged,
was prompted alone by the consideration of the relinquish-
ment of dower. Why does the defendant agree to give
negroes of the value of $4,000 or $4,500, to procure a relin-
quishment of the contingent right of dower in land which he
was selling for $2,600. No plea of incapacity, of duress, of
fraud, or of imposition, is set up. What conceivable motive,
then, unless we violate the rules of law by allowing him to
say that he intended to defraud his wife, can be attributed to
him, than a design to make a provision for her out of the
property bequeathed to her by her father? The stress laid,
in all the conversations between the parties, upon the fact
that the negroes were received through the wife, is persua-
sive to show that reference was had to that fact in making
the contract; and it is a most significant fact, bearing on this
question, that the defendant, in his answer, admits that, after
his wife had signed the deed to Wilkinson, he said "he was
willing for her to have her stuff." Why does he characterize
the property in question as "her stuff?" He himself says
that the title had already vested in him. How, then, was it
"her stuff?" Only because that, with other property, had
been derived through his wife, and he conceded to her a
moral right to at least a part of it. Besides, this remark was
made after the complainant had signed the deed, and, it is
inferrible from the answer, in immediate connection with her
performance of that act. Now, why this willingness for her
to have the negroes, and why the qualification of the negroes
as "her stuff," in immediate connection with her signing the
deed? The plain import of the thing is, This is "your
stuff": it is already yours morally; and on that account, and
because you sign the deed, I will give it up to you.

It must be remembered, too, that the complainant and de-

29

fendant have no children, the fruit of their intermarriage. With that fact in view, and taking into consideration the proportion which Sarah and her increase bore to the entire property derived by the defendant through his wife, it will be clear that, aside from the relinquishment of dower, there was provided nothing more than a suitable provision for the complainant. Had application been made to a court of chancery, before the defendant reduced the property to possession, a settlement on her, probably of the whole, certainly of not less than half of it, would have been made.—Atherly on Marriage Settlements, m. p. 374.

I conclude, that the bill substantially avers, and the proof, aided by the admissions of the answer, shows, that the obligation to provide for the complainant, and the moral right springing out of the legacy received by his wife, were inducements to the defendant to make, and to the complainant to exact, the promise of a conveyance of Sarah and her children; and that this court ought not, on account of the inequality of the consideration, to refuse to the complainant a specific performance.

Although this court will sustain a voluntary settlement in favor of the wife, *when executed*, I admit that it will refuse to specifically perform, as against the party himself, *an agreement* to make a voluntary settlement. It will, however, in favor of the wife, enforce an agreement to make a settlement, against the heir, or any other person than the party making the contract.—Atherly on Marriage Settlements, marginal pages 183 to 186, and 131 to 134. It must be conceded, also, that the reception by the defendant, some years before, of his wife's legacy, which he had reduced to possession, could not, *per se*, constitute a consideration for a promise to convey.— 5 J. J. Mar. 545; Atherly on Marriage Settlements, marginal pages, 156, 164, 166, 301, 303, 304, 305. Then neither the moral obligation of the defendant to provide for his wife, nor the fact of his having received an estate by his wife, nor the two together, would, of themselves, justify this court in enforcing a promise to convey, superinduced by those considerations; but, when superadded to a valuable consideration, irrevocably executed on the part of the complainant, they will impel a court of equity to withhold its refusal of a specific

performance on account of the disproportion of the valuable consideration.

Why is it that an executed contract, based upon the moral considerations which I have mentioned, will be sustained, while an unexecuted agreement, based upon the same considerations, will not be enforced, *against the party making the agreement?* Why is it that an agreement to make a settlement, if founded upon these considerations, will not be enforced against *the party to the agreement,* but will be enforced against *his heir?* By reference to Atherly on Marriage Settlements, pages 131 to 134, it will be seen that, while there are respectable authorities to show that a voluntary agreement to convey will be enforced in favor of the wife, even against the settler himself, the better opinion is, that it ought not to be enforced, because, like a will, it is revocable. There is no other ground, upon which the doctrine, that an enforcement will be granted against the heir of the settler, and not against the settler himself, can be maintained, than that the power of revocation, *locus penitentiæ,* is reserved to the party making the agreement. Upon what other conceivable basis can such a distinction, between the right as against the heir and as against the ancestor, rest?

In this case, the defendant cannot have the power of revocation, because, superadded to the moral consideration, there is a valuable consideration, executed on the part of the complainant. I do not think that the defendant could even rescind or set aside the contract in equity, without doing violence to the decisions in the cases of Judge v. Wilkins and Juzan v. Toulmin, *supra;* and, *a fortiori,* he could not, of his own volition, revoke it. If, then, the admixture in the transaction under review of a valuable consideration deprives the contract of its revocable character, shall a performance be refused on the ground that it is revocable? There is only one reason why an agreement to make a settlement upon the wife will not be executed against the husband, on account of the moral consideration involved; and that is, that the party making the agreement has the power of revocation. In this case, there is no power of revocation, and therefore the rule does not apply.

Why is it that a specific performance will not be decreed,

when the consideration is grossly inadequate? It is because the inequality of the consideration proves that the contract was inequitable and unconscionable. Indeed many of the authorities go so far as to hold that inadequacy of consideration, unless accompanied by fraud or imposition, will not induce a court to refuse a specific performance; and such, perhaps, would be a fair deduction from the reasoning of Judge Dargan, in Judge v. Wilkins, 19 Ala. 771. See, also, Seymour v. Delancy, 3 Cowen, 445; Garnett v. Macon, 2 Brock. 185; White v. Thompson, 1 Dev. & Bat. The contract may be sustained in this case; and yet it may be conceded that inadequacy of consideration, when it shows that the contract is unfair and unconscionable, justifies the refusal of a specific performance. To determine whether the inadequacy of consideration shows the contract to be unfair and unconscionable, we must look to the circumstances surrounding and immediately connected with the contract. Looking to the facts, that there were no children of the marriage, that complainant was defendant's wife, and that defendant received a considerable estate by his wife, out of which she had exacted no settlement, no impartial mind can conclude that complainant, when she assigned her dower, did not give enough to render the defendant's agreement fair, equitable and just.—See Gosden v. Tucker, 6 Munford, 1; in which case, I think it fair to infer that similar considerations to those which I have set forth influenced the court.

The consideration of marriage settlements is never closely scanned. Why, then, should the considerations of agreements for marriage settlements be closely scanned?—Atherly on Marriage Settlements, 165, et seq.; Pinney v. Fellows, 15 Vermont, 525. In Brown v. Jones, 1 Atk. 189, a declaration of Lord Hale's is approvingly quoted, to the effect that, in family agreements, a court does not nicely investigate the value of the estates, but only whether it is a fair and honest agreement.—See Stapleton v. Stapleton, 1 Atk. 2. In this case, it is an important fact, that the defendant has induced the complainant, acting on his promise, to part with a right of value to her. Is he not, therefore, estopped from saying that the contract must not be performed? However this

Andrews v. Andrews.

may be, it is clear that the court, in such a case, ought to struggle hard to enforce the contract against him.

The fact that personal property is the subject of this contract, does not in any wise militate against a specific performance. The reason why a court of chancery does not specifically perform contracts in reference to personal property generally, is, that there is a remedy at law in a suit for damages. In this case, there is no remedy at law : the contract is void at law. The authorities are clear on the point. Atherly on Marriage Settlements, 90; 2 Story's Eq. § 1372; *ib.* §§ 716, 726.

I have examined, with the care it merits, the argument of the complainant's solicitor, designed to show that I should remove the defendant from the office of trustee, or hold that he will not be clothed with that office by law as to this property; and I am compelled ·to dissent from it. If the bill showed that the complainant was separated on account of the improper conduct of the latter, or that the defendant intended to remove from the State unaccompanied by his wife, or that there were grounds to apprehend the denial of the complainant's·right after it was settled by this court, or that the defendant's habits were such as to render him incapable of .or unfit for the discreet and proper management of the estate, I might, by a decree, have appointed a trustee, or forbid his interference with the property; at least, I should have carefully examined the proof, with a view of so deciding. Under the allegations of the bill, however, I cannot do more than establish the complainant's separate interest in the property.

I have considered all the arguments presented by the counsel on both sides in their written briefs; and I would here give the result of my examination, but that I do not desire to extend this opinion beyond its present unusual length. I have found among the papers no written exceptions for the defendant; and I do not pass upon complainant's exceptions, because I have decided the case on the merits in her favor, without the testimony excepted to.

The register will enrol and enter on the minutes of the court the following decree :

1. It is ordered, adjudged, and decreed, that complainant's

exceptions to testimony, marked, filed, and numbered from one to eleven inclusive, be made a part of the record in this case.

2. It is ordered, adjudged, and decreed, that defendant's demurrer be overruled.

3. It is ordered, adjudged, and decreed, that the title to the negro woman Sarah, and her children Anthony, Angeline, Jenny, George, John, and Hannah, heretofore vested in the defendant, Richard I. Andrews, be, and the same is hereby, divested out of him, the said Richard I. Andrews, and vested in the complainant, Mary Ann Andrews, to her sole and separate use, and independently and exclusively of her said husband.

4. It is further ordered, adjudged, and decreed, that the said defendant, on or before the first day of the next term of the chancery court for the 28th chancery district of the State of Alabama, shall execute and deliver to the register of the chancery court for said chancery district, for the complainant, a conveyance by him to her of the above-named negroes, to have and to hold the same to her sole and separate use.

5. It is further ordered, adjudged, and decreed, that the defendant pay the costs of this suit, to be taxed by the register.

From this decree the defendant appealed, and he here assigns it as error; while, on the part of the appellee, there are cross assignments of error, which it is unnecessary to notice.

WM. H. WALKER, for the appellant, and E. J. JONES, contra, submitted the case on written arguments, of which the subjoined briefs are abstracts,

*Points and authorities for the appellant.*

1. There is a fatal variance between the allegations and proof. The bill alleges a contract, by which defendant, in consideration that complainant would relinquish her right of dower in certain lands sold to Wilkinson and Ezzell, promised to give her, for her separate use and benefit, certain negroes known as Sarah and her children. The proof shows a promise " to let her have her stuff which her father had given her," which would include the boy Pleasant, as well as Sarah and her children; that this promise was made after

complainant had relinquished her dower in the Wilkinson tract of land, and to induce her to relinquish her dower in the Ezzell tract; and there is no proof whatever of the allegation that the gift was to the separate use of the complainant. In this state of doubt and uncertainty as to material terms of the contract, a specific performance cannot be decreed; for the law requires that the contract itself must be certain and definite, and must be proved as alleged.—1 Younge, 346; 4 Watts & Serg. 329; 1 Madd. 382; 3 Yerger, 18; 1 Johns. Ch. 131; 2 Wheaton, 336; 14 Peters, 77; 5 Wendell, 638; 2 Sumner, 295; 4 Porter, 297; 5 *ib.* 345; Clements v. Kellogg, 1 Ala. 330; Gibson v. Carson's Adm'r, 3 *ib.* 420; Freeman v. Swan, 22 *ib.* 106; Crabb's Adm'r v. Thomas, 25 *ib.* 212; 18 *ib.* 353.

2. Under all the circumstances of the case, if the contract had been proved as alleged, a court of equity will not enforce it. The contingent right of dower in the Ezzell tract of land is proved to have been worth not more than $100; and the right of dower in the Wilkinson tract, according to the relative prices of the two tracts, may be estimated at $160; while the negroes are proved to have been worth at least $4,200. The gross inadequacy of this consideration, which is the only actual consideration proved or alleged, is sufficient, of itself, to induce the court to refuse a specific performance. The meritorious consideration which is merely suggested in the bill, and on which the chancellor sustained the agreement, is not alleged as any part of the consideration, nor is it established by the proof. The property received by the defendant, from the complainant's father, consisted of the two negroes, Sarah and Pleasant, and some $300 in money. All the expense and trouble of raising the children of Sarah has been borne by him. Of the $6,000 debts proved to be owing by him, the fair presumption is that a portion of the debts was contracted by the complainant. After the payment of these debts, the property left to the defendant is but a small pittance, the greater portion of which consists of lands in Arkansas, in which the complainant has a dower interest. The complainant, moreover, is entitled, under the will of her father, to a distributive share in certain slaves bequeathed to her mother for life; and these she may have settled upon her, by a decree of this court, for her separate use. The circumstances, too,

under which the defendant's promise was made, show that it was not intended as a contract, and it ought not to be so regarded. The conduct of the complainant, in inducing the defendant to believe that she would go with him to Arkansas, and to sell out all this property under this impression, and then exacting a promise that he would give her all her property, before she would relinquish her dower in the last tract of land, justified the defendant in meeting her on her own ground, and repelling strategy by strategy. On these points the following authorities are relied on: 1 Story's Equity, §§ 254, 246; Gould v. Womack, 2 Ala. 91; 6 Johns. Ch. 222; 5 Cowen, 521–35; 4 Peters, 311; 2 Strobhart's Equity, 2 Ala. 604; 9 *ib.* 685; 21 *ib.* 371; 7 *ib.* 71; 11 *ib.* 386.

*Points and authorities for the appellee.*

I. Is the contract proved as alleged? The answer is a qualified denial of the contract, but it is discredited as evidence.—Pharis v. Leachman, 20 Ala. 664; Gunn v. Brantly, 21 *ib.* 633. The answer is contradicted, as to the amount of property received by defendant from complainant's father, by the record from the orphans' court; and as to the amount of property owned by him, and his condition after paying his debts, by the witnesses Long, Ezzell, Stinnett, and others. If the answer is considered as evidence, the contract is supported by the testimony of W. P. Long, Mrs. Beckham, Eliza West, and McKinney.

II. Being proved as alleged, will the court enforce it?

1. At law, husband and wife are one, and their contracts are void; but equity treats them as distinct persons, capable of contracting with each other, of suing each other, and of having separate estates and interests.—2 Story's Equity, §§ 1368, 1372; Livingston v. Livingston, 2 Johns. Ch. 538; Garlick v. Strong, 3 Paige, 440; Hoot v. Sorrelle, 11 Ala. 396; Williams v. Maull, 20 Ala. 730; Shepard v. Shepard, 7 Johns. Ch. 60.

2. The wife's contingent right of dower is peculiarly known, is carefully guarded by the laws, and cannot be forced from her by her husband.—Owen v. Paul, 16 Ala. 131; Parks v. Brooks, *ib.* 529; Thrasher v. Pickard, 23 *ib.* 616. It occupies, therefore, as high a position as any other separate estate.

3. Several of these cases show that it makes no difference whether the contract is executed or executory.—Garlick v. Strong, *supra;* Hoot v. Sorrelle, *supra;* Livingston v. Livingston, *supra.*

4. The contract being between husband and wife, it was not necessary to use the words "sole and separate use."—Williams v. Maull, 20 Ala. 730; McWilliams v. Ramsey, 23 *ib.* 816; Gamble v. Gamble, 11 *ib.* 972; Puryear v. Puryear, 16 *ib.* 488; 2 Story's Equity, § 1373.

5. The adequacy of consideration is not material between these parties. The court will not regard the consideration, unless the inadequacy is such as to shock the conscience, and furnish conclusive evidence of fraud; which, as between these parties, could hardly be presumed.—Judge v. Wilkins, 19 Ala. 771; Juzan v. Toulmin, 9 *ib.* 686; Lawrence v. McCalmot, 2 How. (U. S.) 452; 3 Cowen, 446.

6. The relinquishment of dower was the only legal consideration; but the relation of the parties, and the fact that the property came from the wife, furnish strong additional motives and moral considerations.

7. The husband denies that he meant what passed for a promise. If this be true, he was attempting to practice a fraud on his wife; and, for that reason, he cannot be heard to complain.

8. The defendant is estopped. He made the promise, treated the consideration as sufficient, and stood by until his wife acted; and he cannot now be heard to dispute his promise.—Center v. P. & M. Bank, 22 Ala. 743; Steele v. Adams, 21 *ib.* 534; McCravy v. Remson, 19 *ib.* 430; Pool v. Harrison, 18 *ib.* 514.

III. What is complainant's remedy?

1. The contract should be specifically enforced. The complainant has done all she had to do, and can never be placed in *statu quo.*—Casey v. Holmes, Bott & Earle, 10 Ala. 777. All the terms of the contract are sufficiently certain; and, even if any doubt existed, the court, in a case like this, will struggle hard for the meaning.

2. If there be any uncertainty in regard to the lands, it can make no difference, because that part of the contract is executed. It would only be important in point of consideration;

so that, if all the negroes were to be given, it ought not to defeat this suit, because there is no doubt about those claimed. If there be any doubt, the wife is not claiming against that doubt.

3. A specific performance ought to be granted, because the negroes are family slaves.—Baker v. Rowan, 2 Stew. & P. 361; Hardeman v. Sims, 3 Ala. 747.

4. As to specific performance, see, also, Pulliam v. Owens & Russell, 25 Ala. 492.

But, if not entitled to a technical decree of specific performance, the complainant is nevertheless entitled to a decree for the negroes, on another ground.

1. She is not *sui juris*, and cannot sue at law on the contract. Upon that ground she has the right to come into equity, and that court must give her such relief as a court of law would give a party *sui juris*.

2. In a court of law, a party *sui juris* might recover these negroes on this contract. Detinue lies to recover specific personal property, whenever the plaintiff has the general property, and the right to immediate possession.—1 Chitty's Pl. 121. In this case, the property in the negroes, by the contract, would have vested in the vendee.—Chitty on Contracts, 375; Screws v. Roach, 22 Ala. 676; Magee v. Billingsley, 2 *ib.* 677.

3. Upon a recovery in detinue, the delivery of the property could be enforced by *distringas*.

4. In trover for slaves, the measure of damages is their value.—Tatum v. Manning, 9 Ala. 144; Lee v. Matthews, 10 *ib.* 682; Sedgwick on Damages, 260–70; Worthy, Brown & Co. v. Patterson, 20 Ala. 174; Willis v. Dudley, 10 *ib.* 933; 5 Conn. 222.

GOLDTHWAITE, C. J.—The decree of the chancellor is correct, both in its reasoning and results, and must be affirmed, at the costs of the appellant.